[See Case No. 14,880.]

MACKENZIE (MANDEVILLE v.). See Case No. 9,014.

## Case No. 8,857.

McKENZIE et al. v. The OGLETHORPE.

[2 Betts, D. C. MS. 35.]

District Court. S. D. New York. Sept. 21, 1841.

SEAMEN'S WAGES—MASTER'S CONTRACT—ILLEGAL VOYAGE—NAVIGATION ACT—DAMAGES FOR NONPERFORMANCE.

[1. A ship is bound by her master's contract with seamen for any voyage for which he has authority to engage her.]

[2. Foreign seamen, unwittingly shipping for a voyage wherein the navigation acts forbid their employment, may recover in rem damages resulting from nonperformance.]

[This was a libel for seamen's wages by McKenzie and others against the ship Oglethorpe, Knox, claimant.]

PER CURIAM. The defence made by the answer and supported by the testimony of the master, presents an eminently hard case on the part of the owner, if the demand of the libellants is to prevail. The ship took out a crew from this port on a circuitous voyage to Glasgow where the men deserted and the libellants with others were shipped in their place. This employment, the defence asserts, was specifically limited to bringing the ship to her home port, and it meets the objection that foreign seamen could not be expected to hire on such terms, by allegations that the rate of wages here were higher than in Scotland, that there was a great excess of seamen above the demand for them at Glasgow, and that they were anxious for opportunities to get to this country. This representation is corroborated by many intrinsic facts and presumptions. The vessel was bound to her home port and the common understanding would obviously be, that her voyage would then terminate and she would be at the absolute disposal of her owners. It was moreover notorious that the crew required was to supply the places of deserters, and this would indicate very clearly, that the new crew were only to fill out and complete the service begun by the former one, and would not be sought for to enter on any new prolonged adventure. Another consideration which, it must be presumed, would influence the master, was, that he could not but be apprized that by the laws of this country he would not be allowed to take a crew of foreigners in his ship out of the United States, and that accordingly any contract of his to that end, would be arrested here and he be prevented fulfilling it. Supposing, then, that the master acted with common fairness and had no more than the humblest understanding of his duties, the presumptions would be strong and persuasive that he contracted with the libellants only as he asserts to serve from Glasgow to New York.

The libellants however support their demand by a mass of proof too direct and of too great weight, to be displaced by mere presumptions and inferences or to be counteracted by the single testimony of the master. Three witnesses not interested in this controversy called by the libellants and one called by the claimant, all unite in swearing that the contract with the libellants was for a voyage to New York thence to other ports in the United States or South America and back to a British port. Two of the libellants examined as witnesses for each other, testify to the same facts. There is some variation in the meaning of the witnesses, as to the intermediate points of the voyage, but all agree in this, that the ship was to go to New York from Glasgow, and to return to a British port as her final terminus. The court would be compelled to yield to this weight of proof of the contract, if only influenced by the mere balance of evidence but there is connected with it an additional particular, adding to its force as against the claimant. The libellants all signed articles in Glasgow, and these witnesses assert those articles specified the terms of the agreement. The master admits the existence of articles, but says he refused to receive them or allow them to come on board his ship because they were British articles and that accordingly the broker, who shipped the men, in his presence separated the signatures of the crew from the heading or contracting part

of the agreement and told the master he might annex that part to his American articles. He accordingly connected it by wafers to the bottom of his ship's articles.

Whatever the inducement or excuse might be to this procedure it is palpable that the statements of the witnesses as to the general contents of the agreement must on this hearing be conclusive against the claimant. He yet holds the written contract, which he could produce in court, or he might have examined the brokers abroad, if he does not assent to the version given by the libellants. The court must then proceed upon the fact that a written contract of the purport alleged by the libellants was made with the crew, by the ship's broker, and that it was placed in the hands of the master before the crew entered on board and that they have never assented to the destruction or alteration of that contract. Did the brokers abroad exceed their authority, or if they acted under the instructions of the master, could he charge the ship and owners upon the agreement so entered into with the libellants?

There being no other evidence of the understanding upon which the brokers were to obtain a crew, than the testimony of the master, it must in this case be regarded as proved that they were employed specifically to ship men for the remainder of the voyage and accordingly had no authority to make stipulations, binding the vessel to them for any services after her arrival at New York. The captain swears positively to this point and there is no evidence produced by the libellants which can countervail the proof. He goes farther and asserts that he never mentioned the ports named in the contract and that he could not have suggested expectations of going such a voyage, because he had never been at Charleston or Savannah and had no knowledge whatever of the intention of the owner to employ the ship on that route. There are many circumstances conducing to the persuasion that this statement is not entirely ingenuous. Why would the ship brokers at Glasgow engage men on such a voyage unless they gathered from the captain the idea that the ship was expected to perform it? And when the articles were offered him no exception was taken to the terms of the contract but his natural pride fired up at the indignity of placing on board an American vessel, shipping articles bearing the insignia and stamp of royalty. It is moreover to be remembered that the last voyage was from New Orleans to Glasgow, and that the ship was ordinarily engaged as a carrying vessel from New York to Southern ports and then to Great Britain. Besides, it is in evidence that the master offered the libellants to continue them on board if they would sign American articles and obtain their certificates of citizenship or protection and one of the crew testifies that he is yet retained on board to perform the voyage for which he shipped with the libellants and the owner, when he first heard of the difficulty with the crew, immediately ordered them to go on board and complete their voyage with the ship without objection to the contract claimed by them.

Upon these circumstances it is incredible that the contract framed, was a mere invention of the ship brokers and that there was no design or expectation when the crew were shipped that the vessel would after her arrival at New York be despatched on the voyage indicated in the articles. This evidence would certainly go far to uphold the contract as authorized by the captain if it stood alone opposed to his oath; but the libellants are entitled to the benefit of the ratification of the entire contract implied in law, from his accepting the articles and the service of the crew under their engagement. I feel, therefore, no difficulty in holding that the libellants have sufficiently established the validity of the contract of the brokers with them, so far as it respects the authorization of the master.

The remaining consideration is whether the master had power to bind the ship by the agreement so made by him. In discussing this proposition of law, every reasonable intendment is to be made in support of the act of the master and it must accordingly be assumed that he was controlled by no special instructions (none being shown) and that he might exercise to the fullest degree the powers incident to his office and situation. He was the commander of a trading vessel, on a circuitous voyage. He was then performing one from New York to a Southern port in the United States thence to Glasgow and back to New York, and the fair bearing of the proofs is, that she had been employed in similar voyages antecedently and that she was to continue in a like business. In shipping a crew then, is the authority of the master limited to the voyage already fixed upon or in progress or may he engage with them prospectively and contract for a voyage not yet declared or adopted by the owner? Each branch of this inquiry suggests a topic important to ship owners and mariners, but neither need be decided to its fullest extent, in order to dispose of the issue between these parties. The master might undertake to engage the ship to a crew, for periods so indefinite and remote, as to afford palpable proof of fraud upon the owners and if not to impute a participation in it to the seamen, at least, to amount to a plain caution or notice to them that the contract was beyond the authority of the master. As general agent of the owner, the master is clearly empowered to contract in correspondence with the apparent service of the ship (Abb. Shipp. pt. 2; The Tribune [Case No. 14,171]), nor do I feel disposed to throw a question upon his authority to engage men beyond the period that may be necessary or even proper in respect to the employment in which she is engaged.

The limits of a general agency of this character must from the nature of the case be indefinite and fluctuating and the law will accordingly impose the chief hazard of it on the party instituting it and protect the one honestly confiding in it. The master, wanting seamen, incontrovertibly has the power to hire them for a fixed period of time, a month, six months, a year. The possession of a vessel requiring to be navigated is a letter of authority to the master to contract for her employment (Abb. Shipp. pt. 2, c. 2) and this would seem to be without regard to the time necessary to fulfill the service (Abb. Shipp. p. 92, note 1; Id. p. 99; Holt, Shipp. p. 3, c. 1, § 1). And as the master has power to engage his vessel to a series of voyages (or for an indefinite period) he must necessarily have a like authority to provide seamen for such voyages. Take the instance of this ship, seeking freight in Glasgow. By the well-established principles of the maritime law the master might have chartered her or engaged on a stipulated freight, to run the very voyage for which he hired the libellants. Id. pt. 2, c. 2; Id. pt. 3, c. 1; Abb. Shipp. pt. 2, c. 2; 3 Kent, Comm. 161. And as it is the usual duty of the master to hire mariners for his vessel, his authority to make contracts of the most favorable character in this behalf will be presumed (Story, Ag. 119), where there is no express restriction upon it proved and where it is exercised out of a home port. At least his authority in this particular will not be regarded as narrower than that for the letting or employment of his ship. I perceive therefore in this case clear proof that the master contracted with the men for a voyage beyond the mere return of the vessel to her home port, and to be continued at least until the restoration of the seamen to the country of their residence, and I should be very unwilling to declare such a contract void or inoperative. It may happen that the only condition upon which American vessels, in their necessity, can obtain foreign seamen abroad, is to engage the return of the ship to the place they are taken from; and it seems to me that in all cases it would be no more than a reasonable stipulation and one therefore which ought to bind the ship.

It is contended that our laws prohibit taking out of the United States ports a crew of foreigners, and that a contract to that effect would accordingly be abrogated by the statute. It is true that at least two-thirds of the crew must be American citizens, but it was no part of the contract with the libellants that they should be qualified to serve in conformity to the requirements of our laws. It belonged to the master or owners to see that the contract could be fulfilled on their part and I apprehend a party would never be permitted to set up for his protection and in avoidance of his contract with a foreigner, that the execution of it would involve the violation of his own municipal laws. The English courts enforce contracts entered into

with intent by both parties to violate the revenue laws of a country. (6 C. Rob. Adm. 348; 1 Doug. 252; 1 Cowp. 343), and navigation laws probably would claim no higher sanction than kindred acts in relation to imports. Here there is no pretence that the libellants contracted with any intent to violate the law of this country or with any knowledge of its provisions. Their contract may be bona fide and meritorious, and if the master led them into an engagement which he would not be allowed to fulfill in his own country, their claim to remuneration instead of being barred by such occurrence would rather appeal with a more urgent equity for that cause to the protection of the proper tribunals. This is so even when the vessel is condemned and their lien is lost, because she was engaged in an illegal voyage. [The St. Jago de Cuba] 9 Wheat. [22 U. S.] 409; [Sheppard v. Taylor] 5 Pet. [30 U. S.] 675; Edw. Adm. 35; 6 C. Rob. Adm. 207, 350. The law implies in protection of seamen, the engagement of the master and owners, that the stipulated voyage is legal in regard to foreign governments and their own, and awards them damages, when it is proved that they have been drawn into a contract that is illegal. 3 Kent, Comm. 188. The voyage must be considered as broken up in this port, either because the master was not suffered by our law to carry it into execution at his own election or that of the owner. There being no default of the seamen, and the ship remaining as she was at the time of the contract, they are entitled to compensation in damages against the vessel. Abb. Shipp. 450, note 2; 2 Hagg. Adm. 158; Emerson v. Howland [Case No. 4,441]. I am rather inclined to regard this in the nature of a voyage broken up, in respect to the libellants, to the same degree that it would be, had the laws of the United States interdicted the voyage which the master contracted for. It would then be clear of the character of a wilful and wrongful act. In such cases, seamen are not held entitled to recover wages for the entire voyage agreed upon, but an allowance by way of wages, that shall compensate them for the loss sustained. This is plainly the spirit of the adjudications upon this subject. Woolf v. The Oder [Id. 18,027]; Hindman v. Shaw [Id. 6,514]. Broader damages are given when the case is marked by acts of fraud on the part of the owner or master. 3 Johns. 510.

I think there is no ground in this case to impute fraud or circumvention to the master. Independent of his testimony upon this head, it appears from the evidence of one of these foreign seamen, that he understood the contract to allow them to leave the ship in New York if they chose to do so. He plainly regarded the prolonged voyage named in the articles as a privilege which the crew could enjoy if they preferred continuing with the vessel to leaving her here. So, also, the suggestion to the libellants that they should be

provided with passport protections, and the offer of the owner to continue them on board, all indicate that there was no purpose to enveigle the men to this country and then abandon them without furnishing them employment. But if the construction urged by the libellants' counsel is adopted and it be held that the master contracted with these men fraudulently and has wilfully violated the contract, that in order to give damages according to the measure proposed, there should be clear and consistent proof of the voyage agreed for. Except in the two particulars of running to New York and the termination of the voyage in Great Britain it would be impossible upon the evidence produced for the court to decree what were the termini or what the probable duration of the voyages stipulated for, after leaving New York. The court could not accordingly avail itself of that branch of the contract as a measure of damages in any respect. If the intermediate port was Charleston, the voyage might be protracted a fortnight—if South America, for a series of months. Taking then the agreement so far as the concurring weight of evidence defines it, I shall hold that the libellants are entitled to wages at the rate contracted for, to this port; for one-half a month here as a reasonable period after they knew the voyage was abandoned to enable them to obtain an opportunity to return and also for such time as will ordinarily be occupied in a voyage from New York to Liverpool or Glasgow. This time will be ascertained by the clerk.

A decree will be entered in conformity to these principles.